JENKS and HOOKER, JJ., concur. GAYNOR and MILLER, JJ., dissent.

---

In re O'GORMAN'S WILL.

(Supreme Court, Appellate Division, Second Department. June 18, 1908.)

1. WILLS—PROBATE—EVIDENCE—SUFFICIENCY—TESTAMENTARY CAPACITY.
    Evidence examined, and a finding that testatrix was not of sound and disposing mind and memory *held* against the weight of evidence.
    [Ed. Note.—For cases in point, see Cent. Dig. vol. 49, Wills, §§ 137–161.]

2. SAME—UNDUE INFLUENCE.
    Evidence examined, and a finding that the execution of a will was procured while testatrix was under restraint and undue influence *held* against the weight of evidence.
    [Ed. Note.—For cases in point, see Cent. Dig. vol. 49, Wills, §§ 421–437.]

3. SAME—APPEAL—DETERMINATION AND DISPOSITION OF CAUSE—REVERSAL.
    Under Code Civ. Proc. § 2588, where the reversal by the appellate court is founded on a question of fact, the appellate court must, if the appeal is taken from a decree made on a petition to admit a will to probate, make an order directing the trial by a jury of the material questions of fact.

Appeal from Surrogate's Court, Orange County.

Application by Francis A. Curry for the probate of the will of Julia O'Gorman, deceased. From a decree in favor of contestants, denying the probate, proponent and the residuary legatee and devisee appeal. Reversed, and issues ordered to be tried by a jury.

Argued before WOODWARD, JENKS, HOOKER, RICH, and MILLER, JJ.

Alton B. Parker (John F. Cloonan, on the brief), for appellants.
August L. Martin (Henry W. and Russell Wiggins, on the brief), for respondents.

HOOKER, J. The learned surrogate has denied probate of the will of Julia O'Gorman, deceased, and appeal comes to this court from

his decree. The grounds upon which the decree is based are that the deceased was not of sound and disposing mind and memory, but was a person of unsound mind and memory and was not competent to make the will, and that its execution was procured while she was under restraint and undue influence of the persons named as executors, legatees, and devisees.

The finding of the learned surrogate that the deceased was not of sound and disposing mind and not competent to make a will is to my mind so clearly against the weight of evidence that it is perhaps unprofitable to enter into a detailed discussion of the evidence on that branch of the case. It is sufficient to point out that the family physician, who had been in attendance for years before her death, was relied upon principally by the contestants to establish the mental condition of the deceased; but in answer to a question by the learned surrogate he stated:

"I think that she was of sound mind. I would have to say to that; yes, sir. * * * Her mental condition as to susceptibility of influence was such that she could be influenced to a certain extent. I do not think that Mrs. O'Gorman could be influenced to do anything against her own interests. I do not think any one could influence her that was at any time against her own interests."

The witness Nagle, called by the contestants, testified that she had been a servant in the O'Gorman residence for 19 years. She said that the deceased remained in good health up to the time of her death, except that her heart bothered her a little, saying:

"Once in a while she had weak spells. * * * She never acted to me as if she didn't know what she was talking about. She always acted as though she knew what she was talking about."

Granting that Mrs. O'Gorman was not in as good health after her husband's death as formerly, and that the loss of her husband was the subject of her constant reflection, still the evidence as to her conduct, as to her interest in her estate, and the very intelligent interest which she displayed in augmenting her own property and improving it, together with the direct evidence of her sound mental condition, so far overbore the possible inferences of decaying mentality that the finding of the learned surrogate upon this branch of the case cannot be sustained.

By her will the deceased directed, first, the payment of her debts; second, bequeathed to Catherine Nagle, her housekeeper, $1,000; third, to Minnie Kane, servant, $500; fourth, to Julia Smith, a niece, $1,000; fifth, to Francis A. Curry, one of her executors, $1,000; sixth, to Millie A. Westervelt, the daughter of Warner W. Westervelt, who had been her attorney, and for many years previous to that the confidential attorney of her deceased husband, $1,000; and, seventh, all the rest and residue of her estate to her infant son, Edward M. O'Gorman. Deceased had eight children, all of whom were married and had left home prior to her decease, except the infant son, Edward M., who was at that time in school. He was just reaching the age of 18 years at the time the will was made. Her husband predeceased her by some three years or more, and by the provision of his will he left the life use

of his rather large estate, consisting principally of 107 houses, to his wife, and after her death it was to be divided into eight equal shares, of one of which each of his children was to have the benefit.

Much stress has been laid upon the terms of a certain letter prepared by her husband 14 years before the deceased made her will, and which came to light upon the death of her husband. This letter was directed to his wife and children, and among other things expressed the wish that they might work together for the good and benefit of all, and that they might avoid doing anything by which the shares of any of his children or of his wife should in any manner be diminished. The petition for the probate of the will of Julia O'Gorman disclosed $11,000 worth of property, $4,500 of which was specifically bequeathed, and the residue was to go to the infant son, Edward M. In view of the large estate her husband had left, and of the provision that it should be equally divided among her children at her death, the bequest of $1,-500 to servants, of $1,000 to a niece, and of $1,000 to one of her executors, would not seem to indicate conclusively that she had been induced against her will to make disposition of her estate under some influence antagonistic to the interests of her children. The bequest of $1,000 to the daughter of Mr. Westervelt is so fully and candidly explained by more than one witness that it seems to me any presumption of fraud which might lawfully attach by reason thereof was amply rebutted.

The mother of one of the legatees testified to a conversation she had with the deceased shortly after the making of the will, in which she stated the reasons which impelled her to draw her will in favor of her younger son. Deceased stated that she did so because she thought she was doing right, as her husband had provided for the other children; that they had all been educated, and, when married, had been fitted out; that she felt that the younger son should be educated and should have what the others had had; and she had left her property to him for that reason. It seems to me that the whole testamentary scheme was as much like one which a lady in her circumstances would be apt to make as one which provided for each of her eight children, especially in view of the fact that at the time the will was made the chief beneficiary, her son Edward M., was the only unmarried child, 18 years of age, and in school.

Much is made of the fact that the legatees, the niece and the executor, and their families, were much in attendance upon the deceased for some time prior to her death. It was urged that this was to the exclusion of her own children, and the inference of undue influence is invited. But her own children, except Edward, who was in school, were married and had establishments of their own, except one daughter, a widow; and there is nothing to suggest that, if any of these children had been in a position to leave their established homes and live with their mother, they would not have been as welcome and as happy with her, and she as happy with them.

Proof of undue influence depends in this case, as it must in most, upon circumstances and upon inferences to be drawn from specific facts; but our conclusion, upon an examination of the whole record,

is that the finding of the learned surrogate that the execution of the will was made while the deceased was under restraint and undue influence is against the weight of the evidence.

We must therefore reverse the decree, and, pursuant to the provisions of section 2588 of the Code of Civil Procedure, direct a trial by jury of the issues. The place of the trial and the question to be tried will be specified in the order, which may be settled on notice.

Decree of the Surrogate's Court of Orange county reversed, and issues ordered to be tried by a jury, with costs of the appeal to abide the event of the new trial, payable out of the estate. All concur.